# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

TOMMIE LEE MCDOWELL, JR.,

    Plaintiff

v.

HULSEY, et. al.,

    Defendants

Case No.: 3:19-cv-00230-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 118

    This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

    Before the court is Defendants' Motion for Summary Judgment. (ECF No. 118, errata at ECF Nos. 120-1, 120-2.) Plaintiff filed a response with respect to Count IV against defendant Reubart (ECF Nos. 122, 122-1 to 122-3), and then filed a corrected and superseding response with respect to Count IV against defendant Reubart (ECF No. 124). Plaintiff filed another response brief with respect to Counts I and II against defendant Hulsey. (ECF Nos. 126, 126-1 to 126-3.) On July 9, 2021, Plaintiff filed a declaration authenticating the exhibits filed in support of his responses. (ECF No. 34.)

    Defendants have moved to strike Plaintiff's responses in ECF Nos. 124 and 126. (ECF No. 130.) The court has issued a separate order denying the motion to strike, but the court did strike ECF Nos. 122, 122-1 to 122-3, as they are superseded by Plaintiff's filings at ECF Nos. 126, 126-1 to 126-3.

1    Plaintiff also filed a motion for sanctions against Reubart for failing to provide discovery

2  responses. The court has denied this motion. (ECF No. 135.) It should be noted that Plaintiff did

3  not include a request under Federal Rule of Civil Procedure 56(d), asserting that he cannot

4  present facts essential to justify his opposition with respect to the claim proceeding against

5  Reubart. In fact, in the motion for sanctions Plaintiff represents that he "has undoubtedly

6  mounted sufficient arguments against [the motion for summary judgment]." (ECF No. 133 at 2.)

7    After a thorough review, it is recommended that Defendants' motion be granted.

8                                    **I. BACKGROUND**

9    Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC),

10 proceeding pro se with this action pursuant to 42 U.S.C. § 1983. The events giving rise to this

11 action took place while Plaintiff was housed at Ely State Prison (ESP). (*Id.*)

12    The court screened Plaintiff's complaint and supplemental claims, and allowed Plaintiff

13 to proceed with a retaliation claim in Count I against Hulsey and Ward; a retaliation claim in

14 Count II against Hulsey; a retaliation claim in Count IV against Hammel and Reubart; and a

15 conspiracy claim in Count V against Hammel and Reubart. (*See* ECF Nos. 17 (screening order

16 on original complaint), 18 (complaint), 29 (screening order on first amended supplemental

17 claims IV and V), 30 (first amended supplemental claim IV), 58 (screening order on second

18 amended supplemental claim V), and 59 (second amended supplemental claim V).)

19    Defendants Hammel and Ward have been dismissed without prejudice under Federal

20 Rule of Civil Procedure 4(m). (ECF Nos. 106, 108.) Plaintiff subsequently filed a motion to

21 dismiss Count V without prejudice, which was granted. (ECF Nos. 121, 135. ) Therefore, this

22 action is proceeding only with: (1) the retaliation claim in Count I against Hulsey; (2) the

23

1  retaliation claim in Count II against Hulsey; and (3) the retaliation claim in Count IV against

2  Reubart.

3        In Count I, Plaintiff alleges that on November 14, 2018, Hulsey instructed Plaintiff's

4  cellmate, Jackson, to roll up his property because the security and escort officers were going to

5  get Jackson shortly. Jackson complied and packed up his property. Correctional Officers Beedle

6  and Ward came to the cell and Plaintiff and Jackson were escorted to the showers. Jackson

7  confirmed with Ward what property was his. While the officers were packing Jackson's

8  property, Plaintiff saw his television on the cart. Plaintiff inquired about it, and Hulsey said,

9  "calm down, no one's taking your property." Out of precaution, Plaintiff asked for an emergency

10  grievance, but none of the officers responded. When Plaintiff saw more of his property on the

11  cart, he said he would be writing a grievance. Ward shouted, "do it and see what happens!"

12  Plaintiff returned to a completely empty cell. He started the grievance process and did not

13  receive his property until 12 days later. Plaintiff was allowed to proceed with the retaliation

14  claim based on the allegations that he threatened to file a grievance and the officers confiscated

15  all of his property and left him in an empty cell.

16        In Count II, Plaintiff alleges that prison officials did not return his property to him until

17  November 25, 2018. Between November 14 and 25, 2018, Plaintiff talked to Hulsey multiple

18  times about getting his property back. Hulsey said he would make a call to property if he got a

19  chance and "man, you gotta stop writing these grievances." When Plaintiff followed up, Hulsey

20  said the property room was busy.

21        In Count IV, by way of background, Plaintiff was incarcerated in the Florida Department

22  of Corrections (DOC) in 1995 and 1996 pursuant to an interstate agreement with NDOC. In

23  1996, he was convicted of battery on a law enforcement officer and was sentenced to a five-year

1    prison term, to run consecutively with the life sentence he was serving for his convictions in

2    Nevada. He returned to the custody of Nevada in October of 1996. At that time, a hold or

3    "detainer" was placed on Plaintiff so that if he is released from incarceration for any reason, he

4    will be transferred back to the custody of Florida to serve his five-year sentence. (Aff. of Tammy

5    Budd, ECF No. 118-4.)

6        Plaintiff alleges that in April 2019, Hammel told him he was scheduled for a full

7    classification hearing with Hammel and Reubart to discuss transferring Plaintiff to a different

8    prison. In May 2019, Plaintiff filed this lawsuit, where Reubart was one of the defendants. When

9    Plaintiff spoke to Hammel in July 2019, he learned that Reubart had cancelled the full

10   classification hearing due to an increase in Plaintiff's risk factor score and reactivation of

11   Plaintiff's Florida detainer (implying Reubart had reactivated the detainer).

12       When Plaintiff asked about it, Hammel said he knew nothing about the detainer and

13   commented that Plaintiff "was a very litigious person" and that there would be no transfer at this

14   time. Hammel told Plaintiff to talk to Reubart. When Plaintiff spoke to Reubart, he commented,

15   "You've filed your damn lawsuit." Plaintiff avers that Reubart reactivated the detainer which

16   increased Plaintiff's risk factor score and made Plaintiff ineligible for transfer.

17       Defendants' move for summary judgment, arguing: (1) Plaintiff did not exhaust his

18   administrative remedies before filing suit; (2) Defendants did not engage in any retaliatory

19   action; and (3) Defendants are entitled to qualified immunity.

20                                   **II. LEGAL STANDARD**

21       The legal standard governing this motion is well settled: a party is entitled to summary

22   judgment when "the movant shows that there is no genuine issue as to any material fact and the

23   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

1  *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

2  evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

3  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

4  of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary

5  judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the

6  other hand, where reasonable minds could differ on the material facts at issue, summary

7  judgment is not appropriate. *Anderson*, 477 U.S. at 250.

8        "The purpose of summary judgment is to avoid unnecessary trials when there is no

9  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

10 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose

11 of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

12 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that

13 one party must prevail as a matter of law"). In considering a motion for summary judgment, all

14 reasonable inferences are drawn in the light most favorable to the non-moving party. *In re*

15 *Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

16 *& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the

17 nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

18 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

19 determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

20 *Anderson*, 477 U.S. at 249.

21        In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

22 "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

23 come forward with evidence which would entitle it to a directed verdict if the evidence went

5

uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Exhaustion**

    **1. Legal Standard**

        The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

        The failure to exhaust administrative remedies is "'an affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007).

        Once a defendant shows that the plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff  "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id*. at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)); *Draper v. Rosario,* 836 F.3d 1072, 1080 (9th Cir. 2016) (inmate plaintiff did not meet his burden when he failed to identify any actions prison staff took that impeded his ability to exhaust his administrative remedies, or otherwise explain why he failed to comply with the administrative remedies process)). The ultimate burden of proof, however, remains with the defendant. *Id*.

        Exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 89

(2006). "Proper exhaustion" refers to "using all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id*. (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison grievance process but also to adhere to the 'critical procedural rules' of that process." *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016) (quoting *Woodford,* 548 U.S. at 90). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).

**2. Exhaustion within NDOC**

An NDOC inmate exhausts administrative remedies by utilizing NDOC's grievance process, which is set forth in Administrative Regulation (AR) 740. An inmate must proceed through three levels of grievances for a claim to be considered exhausted: informal, first and second levels. An inmate may not file a grievance on behalf of another inmate. In addition, an inmate may not include more than one issue per grievance, and an inmate may not file a grievance on the same issue asserted in a previously filed grievance. Nor may an inmate change or modify the claim or requested remedy from one grievance level to another. In the grievance contains one of these deficiencies, the grievance coordinator shall return the original improper grievance with a form DOC-2098, Improper Grievance Memorandum, noting the specific violation.  (ECF No. 118-5.)

**3. Count I**

Again, Plaintiff alleges that on November 14, 2018, Hulsey took Plaintiff's property after Plaintiff threatened to file a grievance.

1    Hulsey acknowledges that Plaintiff did raise this issue in an informal grievance, 2006-30-

2    78184. (ECF NO. 118-6.) Hulsey contends, however, that Plaintiff did not properly exhaust

3    administrative remedies within this grievance as the grievance was rejected on procedural

4    grounds multiple times.

5    Plaintiff, on the other hand, maintains that he did exhaust administrative remedies

6    through grievances 2006-30-78184 and 2006-30-76398.

7    Preliminarily, 2006-30-76398 asserted that the officers involved with the search stole his

8    watch. It does not allege that his property was confiscated and not returned for twelve days

9    because he had threatened to file a grievance. (ECF No. 126-1 at 22-31.) Therefore, this

10   grievance did not serve to exhaust his administrative remedies with respect to this claim. The

11   court will now turn to its analysis of grievance 2006-30-78184.

12    Hulsey argues that Plaintiff did not properly exhaust administrative remedies through

13   grievance 2006-30-78184, while Plaintiff, in essence, argues that administrative remedies were

14   not available to him.

15   In *Ross v. Blake*, the Supreme Court noted three instances where administrative

16   procedures were unavailable to the inmate: First, "when (despite what regulations or guidance

17   materials may promise) it operates as a simple dead end-with officers unable or consistently

18   unwilling to provide any relief to aggrieved inmates" (*i.e.*, a handbook directs inmates to submit

19   grievances to a particular administrative office, but in practice that office disclaims the capacity

20   to consider those petitions). Second, "an administrative scheme might be so opaque that it

21   becomes, practically speaking, incapable of use. In this situation, some mechanism exists to

22   provide relief, but no ordinary prisoner can discern or navigate it." This occurs, for example,

23   "[w]hen rules are 'so confusing that … no reasonable prisoner can use them,' then 'they're no

9

1 longer available.'" Third, administrative remedies are unavailable "when prison administrators

2 thwart inmates from taking advantage of a grievance process through machination,

3 misrepresentation, or intimidation." *Ross v. Blake*, 136 S.Ct. 1850, 1859-1860  (2016).

4       In *Andres v. Marshall*, the Ninth Circuit characterized this as a "non-exhaustive list."

5 *Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017), *as amended* August 7, 2017.

6       The Ninth Circuit has held that improper screening of an inmate's grievance renders

7 administrative remedies "effectively unavailable" such that exhaustion is not required under the

8 PLRA. *Sapp v. Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010) (citing *Nunez v. Duncan*, 591 F.3d

9 1217 (9th Cir. 2010)) . "If prison officials screen out an inmate's appeals for improper reasons,

10 the inmate cannot pursue the necessary sequence of appeals, and administrative remedies are

11 therefore plainly unavailable." *Id.* "To fall within this exception, a prisoner must show that he

12 attempted to exhaust his administrative remedies but was thwarted by improper screening. In

13 particular the inmate must establish (1) that he actually filed a grievance or grievances that, if

14 pursued through all levels of administrative appeals, would have sufficed to exhaust the claim

15 that he seeks to pursue in federal court, and (2) that prison officials screened his grievance or

16 grievances for reasons inconsistent with or unsupported by applicable regulations." *Id*. at 823-24.

17       The court finds that prison officials conduct in this case amounts to improper screening of

18 his grievance. Plaintiff satisfies the first criteria because he demonstrates that he filed a grievance

19 through the second level that would have exhausted his claim if it were not improperly screened.

20 Second, his grievance was screened for reasons inconsistent with or unsupported by the

21 regulations.

22

23

10

Plaintiff filed informal level grievance 2006-30-78184 on February 4, 2019, asserting that on November 14, 2018, all of his property was removed from his cell due to a matter concerning his cellmate. While he was being detained in the shower, he witnessed his property's removal and made inquiry as to what was occurring. He indicated he would be filing a complaint with the authorities. One of the officers yelled out, "Do it-and see what happens." After the property was removed, Plaintiff was allowed to return to his cell, and realized they had taken everything, including his everyday essentials. His complaints went ignored. His property was returned twelve days later. (ECF No. 118-6 at 2-4.)

In response to the original informal level grievance, Reubart said it contained more than one issue, without pointing out what he deemed to be the additional issue. (ECF No. 118-6 at 5.) As a result, Plaintiff asked his caseworker, Cholico, what to omit, and Plaintiff followed her instructions and resubmitted the informal level grievance which was otherwise the same as the prior version. (ECF No. 118-6 at 6-8. ) This time, Plaintiff got a response from Cholico that the grievance was not an addressable claim, without any explanation of why this was the case. (ECF No. 118-6 at 9.) Plaintiff says that he asked Cholico whether that meant that what he was grieving about could not be addressed or further grieved, but Cholico was unable to provide a definitive response.

The grievance was not rejected with an improper grievance memorandum, and so under AR 740 he was permitted to proceed to the first level, which he did. He asserted that his grievance did allege harm: being denied of his essentials for 12 days and being retaliated against. (ECF No. 118-6 at 10-12.) Reubart rejected the first level grievance on the basis that Plaintiff had not attached the informal level grievance. (ECF No. 118-6.)

1    Plaintiff maintains he had attached the informal level grievance and this was an oversight,
2  but he nevertheless resubmitted an identical first level grievance with the informal level
3  grievance attached. (ECF No. 118-6 at 14-16.) Reubart responded with another improper
4  grievance memorandum, this time asserting that the grievance contained more than one
5  appropriate issue. (ECF No. 118-6 at 17.) Again, the response did not advise Plaintiff what the
6  additional issue was. As Plaintiff points out, he had previously submitted an identical first level
7  grievance which was not rejected on this basis. Moreover, he asked his caseworker what the
8  additional issue was, and she said she did not know and did not know why the grievance was
9  deemed improper on this basis. So, Plaintiff proceeded to the second level, only to be told that
10  his grievance had been abandoned for failing to return the grievance with the additional
11  information that was requested, without explaining what additional information was required.
12  (ECF No. 118-6 at 18-20.)

13    This series of events plainly indicates that Plaintiff was given the proverbial "runaround"
14  in attempting to exhaust his administrative remedies through NDOC's grievance process.
15  Moreover, AR 740.03.10 provides: "Comprehensive responses are required for inmate
16  grievances. Statements such as "Your grievance is denied" are not acceptable. *An explanation is*
17  *necessary*." (ECF No. 118-5 at 6, AR 740.03.10.) Telling an inmate that his contains more than
18  one issue without any explanation as to why the grievance is being rejected is inconsistent with
19  this provision of AR 740. This, coupled with the fact that Plaintiff then asked a staff member
20  how to proceed, and followed her directions when given, illustrates that administrative remedies
21  were not available to Plaintiff with respect to this grievance. Moreover, Plaintiff's grievance was
22  rejected at the first level for one reason, but when Plaintiff re-submitted an identical grievance
23  and also attached the informal level grievance as instructed, it was rejected on another basis even

though Reubart did not see fit to reject the grievance on that basis in the first instance. This is the type of "machination" that thwarts an inmate from taking advantage of the grievance process that was referred to in *Ross v. Blake*.

In sum, Hulsey's motion should be denied insofar as it argues that Plaintiff failed to properly exhaust administrative remedies as to Count I.

**4. Count II**

In Count II, Plaintiff alleges that Hulsey did not return his property for twelve days in retaliation for Plaintiff's filing of grievances.

Hulsey argues that grievance 2006-30-78184 was not properly completed, and that even if it were, it did not sufficiently assert a retaliation claim.

The court has already determined that administrative remedies were not available to Plaintiff with respect to grievance 2006-30-78184.

Insofar as Hulsey argues the grievance did not assert a retaliation claim, a grievance is sufficient "if it alerts the prison to the nature of the wrong for which redress is being sought." *Sapp*, 623 F.3d at 824 (citation and quotation marks omitted). The grievance "need not include legal terminology or legal theories" as its "primary purpose … is to alert the prison to a problem and facilitate its resolution, not to lay the groundwork for litigation." *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).

Hulsey acknowledges the grievance said Plaintiff's property was not returned for twelve days. The grievance also alludes to the taking of his property being retaliatory. The court finds this was sufficient to put the prison on notice of the harm for which Plaintiff was seeking redress.

Therefore, Hulsey's motion for summary judgment should be denied as to Count II insofar as it is based on the argument that Plaintiff failed to exhaust administrative remedies.

**5. Count IV**

Plaintiff alleges that Reubart reactivated his detainer and cancelled his full classification hearing because Plaintiff filed this lawsuit.

Hulsey asserts that Plaintiff did not file a grievance addressing the alleged reactivation or reinstatement of the detainer. (ECF NO. 118-7.)

In his response, Plaintiff states that he filed informal grievance 20063090376 on September 26, 2019 (ECF No. 118-7 at 7) and grievance 20063089123 (ECF No. 118-7 at 8), and the response to those grievances states that they are "non-grievable issues" and he could not proceed further. Therefore, he contends he did exhaust his administrative remedies.

Plaintiff appears to assert that administrative remedies were not available to him when he was precluded from proceeding further on grievances 20063090376 and 20063089123. These two grievances can be found in Defendants' own exhibit containing Plaintiff's inmate grievance history. It is unclear why Defendants' assert that no grievance addressed this issue, when it is clear from Defendants' own evidence that Plaintiff did file a grievance raising this issue.

Plaintiff filed grievance 20063089123 at the informal level, stating that it was represented to him by Reubart that a previously dislodged hold/detainer from the state of Florida was reactivated, and he was told Florida reactivated it sometime in July of 2019. His requested remedy was to know exactly why the reactivation occurred. The inmate grievance history indicates that the following was the response: "i/m returned 10-30-19 DOC 3098 State and federal court decision. State, federal and local laws and regulations." (ECF No. 118-7 at 8.)

The court only has the inmate grievance history summary, and not the actual grievance documentation. Without the actual grievance documentation, the court cannot definitively determine from the summary whether Plaintiff properly raised the issue asserted in his retaliation

1  claim in Count IV, or whether administrative remedies were unavailable to him by virtue of the

2  response to the two grievances. As such, Reubart's motion for summary judgment should be

3  denied as to Count IV insofar as it is based on the argument that Plaintiff failed to exhaust his

4  administrative remedies. *See Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled*

5  *on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (an incomplete record is

6  insufficient to establish non-exhaustion).

7  **B. Retaliation**

8      "Section 1983 provides a cause of action for prison inmates whose constitutionally

9  protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791

10  F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a

11  claim consists of the following elements: "(1) An assertion that a state actor took some adverse

12  action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action

13  (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

14  reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v.*

15  *Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

16      "The First Amendment guarantees a prisoner a right to seek redress of grievances from

17  prison authorities as well as a right of meaningful access to the courts." *Id*. (citing *Bradley v.*

18  *Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

19      **1. Count I**

20      According to Defendants, on November 16, 2018, Plaintiff's property was temporarily

21  confiscated as part of a search of Plaintiff's cell because his cellmate was suspected of

22  possessing contraband. (ECF No. 118-2 at 3; ECF No. 118-3.)

23

Hulsey argues that Plaintiff does not allege that Hulsey actually participated in any confiscation of his property. Instead, Plaintiff alleges that while the cell was being searched, he was escorted to the shower area, and he noticed that his television was being loaded onto the property cart. He expressed concern about his property being taken, and Hulsey allegedly responded: "Calm down, no one is taking your property." Plaintiff then noticed more of his property being taken and said he would grieve the issue. At that point, the other officer present, Ward, made a threatening comment. In addition, Hulsey points out that the inventory transfer form was filled out by Ward and Beedle. (ECF No. 118-2 at 3.)

Next, Hulsey argues that even if he did participate in the confiscation of the property, there is no evidence it was done because Plaintiff indicated he would be filing a grievance. Plaintiff alleges he said he would be filing a grievance, but there is no allegation that the correctional officers searching the cell heard him, or that Hulsey heard him.

Hulsey then contends that the confiscation of the property advanced a legitimate correctional goal of safety and security. Plaintiff's cellmate had drugs mailed to him and had a weapon hidden in his mattress. (ECF No. 118-3 at 4.) Prison policy would be to search the entire cell, including the property of the cellmate, as the contraband could be hidden in the property of the inmate's cellmate. (Reubart Decl., ECF No. 118-8 ¶ 9.)

Finally, Hulsey claims that the confiscation did not chill Plaintiff's First Amendment rights as Plaintiff states that after he returned to his cell, a succession of grievance writing activity ensued.

Plaintiff maintains that the property was taken on November 14, 2018, and not on November 16, 2018, for the sole reason of his threatening to file a grievance. He states that Hulsey got on the speaker box to Plaintiff's cell and told Plaintiff's cellmate to roll up his

property as CERT was coming to get him shortly. His cellmate complied and Plaintiff helped

him pack his property. An hour or two later, Beedle and Ward came to retrieve his cellmate.

When asked by the officers if the packed property was his cellmate's, the cellmate responded

that it was. Plaintiff and his cellmate were then escorted to the shower area. Plaintiff asserts that

he later had a discussion with Ward and Hulsey and Ward claimed it was Hulsey that made the

decision to take the property due to having asked for an emergency grievance. Hulsey

subsequently told Plaintiff it was Ward's decision to remove the property for the same reasons.

Preliminarily, there is a dispute about the date that the confiscation of the property

occurred. In their motion, Defendants contend that the property was confiscated on

November 16, 2018. (ECF No. 118 at 2:23-24, 12:8-9, n. 9.) Plaintiff, on the other hand,

maintains that the confiscation occurred on November 14, 2018.

The Inmate Inventory Transfer list has a date of November 16, 2018. (ECF No. 118-2 at

3.) The investigation detail report has an occurrence date of November 15, 2018, and the reports

of Officers Beedle and Rowley state that Plaintiff's cellmate had mail intercepted that was

suspected of containing drugs on November 15, 2018. (ECF No. 118-3 at 2.) The investigation

detail report regarding Plaintiff's cellmate's charges, however, contains an occurrence date of

November 16, 2018. Curiously, the reports of Beedle and Rowley that accompany say that

Plaintiff's cellmate was suspected of introducing drugs into the prison on November 16, 2018,

when their other reports said the date was November 15. Plaintiff, for his part, filed an

emergency grievance on November 14, 2018, which complained about his property being taken

that day. (ECF No. 126-2 at 3.)

1    The court agrees with Defendants that ultimately the date the property was actually

2    confiscated is not significant in determining whether Hulsey is entitled to summary judgment on

3    the retaliation claims.

4    Hulsey has presented evidence that he did not take part in the adverse action of

5    confiscating Plaintiff's property. Hulsey points to Plaintiff's own allegations that Plaintiff was

6    escorted to the shower area and when he expressed concern about his property being taken,

7    Hulsey said: "Calm down, no one is taking your property." This occurred *before* Plaintiff

8    requested an emergency grievance. Moreover, there is no evidence that Hulsey had any

9    involvement in the actual confiscation of the property. Plaintiff asserts that Hulsey was the one

10   that called on the speaker box and told Plaintiff's cellmate to "roll up" his property, but this also

11   occurred *before* Plaintiff said he was going to file a grievance about his property being

12   confiscated. Nor does this evidence prove that Hulsey had any involvement with the confiscation

13   of *Plaintiff's* property.

14   It was Officer Ward that Plaintiff alleges made the threatening comment after Plaintiff

15   said he was going to file a grievance. Moreover, the inventory transfer form was filled out by

16   Ward and Beedle and Plaintiff admits it was Beedle and Ward who came to his cell. The

17   investigation incident report from Ward also states that he was conducted the search of Plaintiff's

18   cell. (ECF No. 118-3 at 4.) This evidence may be indicative of retaliation by *Ward*, but it does

19   not demonstrate that *Hulsey* retaliated against Plaintiff.

20   Plaintiff argues that he had a conversation with Ward where Ward claimed it was Hulsey

21   who made the decision to take the property because Plaintiff had filed an emergency grievance.

22   This, however, is inadmissible hearsay: a statement attributed to Ward when Ward has not

23

1  testified to the statement, and the statement is offered to prove the truth of the matter asserted.

2  Fed. R. Evid. 801.

3  　　Plaintiff has not provided evidence to create a genuine dispute of material fact as to

4  whether Hulsey engaged in adverse action, *i.e.,* confiscating Plaintiff's property. Instead, the

5  evidence reveals that it was Ward and Beedle that took the property. The only action attributed to

6  Hulsey is that he told Plaintiff's cellmate to "roll up" his property, and he told Plaintiff no one

7  was taking his property, but these statements were made *before* Plaintiff said he was going to file

8  a grievance. Therefore, summary judgment should be granted in Hulsey's favor for the

9  retaliation claim in Count I.[1]

10  　　**2. Count II**

11  　　It is undisputed that Plaintiff's property was returned to him on November 25, 2018.

12  (ECF No. 118-2 at 4.) Plaintiff alleges that he was without his basic necessities between the date

13  of confiscation and November 25, 2018.

14  　　Hulsey argues that he was not involved in the return of the property. Instead, it was V.

15  Crowder who inventoried the property upon its return. (*Id.*) Plaintiff alleges that it is his opinion

16  that Hulsey was an instigative component of the scheme of retaliation, but offers no facts or

17  evidence to support this contention.

18  　　Again, Hulsey asserts that even if he was responsible for the return of the property, the

19  deprivation advanced the legitimate prison goal of safety and security because a thorough search

20

21

22
23
---
[1] Plaintiff's response includes interrogatory responses where it appears Hulsey asserted he was not working on November 14, 2018. (ECF Nos. 126-2 at 1-2.) Hulsey does not make this argument as a defense in the motion for summary judgment; therefore, the court need not address this discrepancy.

of the property at a location away from the cell was justified under the circumstances. Hulsey further contends that Plaintiff's First Amendment rights were not chilled.

Plaintiff submits a declaration where he states that between November 14 and 25, 2018, he had "numerous discussions" with Hulsey regarding property issues and other basis needs arising from his property's unlawful removal. (ECF No. 126-3 ¶ 5.)

Plaintiff does not refute the evidence presented by Hulsey that Hulsey was not involved in the return of his property. Nor does Plaintiff explain what the conversations with Hulsey entailed to demonstrate that Hulsey engaged in adverse action because of Plaintiff's protected conduct. Plaintiff's vague statement does not prove that Hulsey was involved in keeping or returning his property, or even if he was, that Hulsey did so *because of* Plaintiff's protected conduct. Therefore, summary judgment should be granted in Hulsey's favor as to the retaliation claim in Count II.

**3. Count IV**

The Florida Department of Corrections (DOC) notified NDOC that Plaintiff was convicted of the crime of battery on a law enforcement officer and was sentenced to sixty months imprisonment, to run consecutively to his Nevada sentence. Florida DOC requested a detainer be attached to Plaintiff. Plaintiff was advised that the detainer would remain in place until Plaintiff was returned to Florida to complete the sentence or until the court took action to dispose of the sentence. (ECF No. 124 at 28; Aff. Of Tammy Budd, ECF No. 118-4.)

In January of 2017, Plaintiff contacted the Florida Department of Corrections (DOC) regarding a representation that had been made that he no longer had a detainer from the Florida DOC. On January 12, 2017, K. Thomas of Florida DOC sent Plaintiff a letter informing him that

1  Washington County, Florida did not have a detainer on file for him. (*See* ECF No. 124 at 22.)

2  This correspondence was copied to Plaintiff's I-file and e-mailed to OMD on

3  January 25, 2017. (ECF No. 124 at 26.) Plaintiff's Offender Information Summary Reflects that

4  the hold/detainer from Florida DOC was inactivated based on that correspondence. (*Id.*)

5          On November 29, 2017, Plaintiff filed a grievance asking if he had an active detainer.

6  (ECF No. 124 at 23.) K. Belanger responded: "Per the NDOC Warrants Coordinator. Inactivated

7  (CS) hold from [Florida DOC] for case #C605207. Per correspondence received from FL DOC,

8  there is no detainer for Washington County FL-the issue has been resolved. Contact is listed as K

9  Thomas Detainer Supervisor. Grievance resolved." (ECF No. 124 at 24.)

10         According to Florida DOC, this was technically correct as Washington County itself had

11  not requested a detainer, but the Florida DOC still had the detainer. (Aff. Of Tammy Budd, ECF

12  No. 118-4.)

13         Plaintiff claims that in January of 2018, he contacted Florida DOC again, through his

14  aunt who is now deceased, about the detainer. He asserts that Florida DOC sent him a letter in

15  response reflecting that he had a consecutive sentence detainer. Plaintiff provides no evidence of

16  the contact with Florida DOC in January of 2018, or Florida DOC's purported response. Plaintiff

17  also argues that he made copies of the letter and forwarded them to Reubart and others, and

18  Reubart told him he had no detainer. Again, Plaintiff provides no documentary evidence or a

19  statement in a declaration to support these assertions.

20         In 2019, Florida DOC became aware that NDOC had removed the detainer from

21  Plaintiff's file in mistaken reliance on the 2017 letter. Florida DOC then advised NDOC that the

22  detainer was still valid, and NDOC reactivated it on July 17, 2019. (Aff. Of Tammy Budd, ECF

23  No. 118-4.)

On August 4, 2019, Plaintiff sent a request to Hammel asking about transfer to another facility. The response states: "Unfortunately your felony Florida warrant has been reactivated so your points are now way too high." (ECF No. 124 at 32.)

On August 9, 2019, Plaintiff sent a kite to Reubart, stating that he had spoked with Reubart about how the detainer from Florida had been "reactivated," but he had prior documentation from Florida and NDOC stating that the detainer had been resolved. (ECF No. 124 at 29.) The response states: "Florida [DOC] reactivated your detain[er] Case # FLDOC 605207 sentenced to five years consecutive to Nevada sentence: reactivated on 7/17/19." (ECF No. 124 at 29.)

On September 3, 2019, Florida DOC IAD Coordinator Iesha Pompey wrote Plaintiff a letter stating that Plaintiff had been convicted for battery on a law enforcement officer, and was sentenced to serve a state prison term of five years, to begin after the sentence in Nevada is completed. (ECF No. 124 at 40.)

Reubart contends that detainers are attached to an NDOC inmate's institutional file to ensure that an inmate is extradited to another state upon release from NDOC custody, either to face criminal charges or serve a sentence for a conviction. (Rutledge Decl., ECF No. 118-10 ¶ 5.)

As associate warden of ESP, Reubart would have had no input into any determination of whether to attach a detainer to Plaintiff's file. Instead, the warrants coordinator of NDOC's Offender Management Division (OMD) coordinates detainers with other states. (Rutledge Decl., ECF No. 118-10 ¶ 5; AR 548, ECF No. 118-11.)

The admissible evidence demonstrates that the detainer was activated in the first place because of Plaintiff's conviction in Florida, and Reubart was not involved in the activation or deactivation of the detainer. (Reubart Decl., ECF No. 118-8 ¶ 7.) Plaintiff sent a kite to Reubart

1  asking about the reactivation of the detainer, but at this point the detainer had already been

2  reactivated, and the kite does not otherwise indicate that Reubart had any involvement in the

3  reactivation.

4          Plaintiff says that Hammel told him that Reubart reactivated the detainer because Plaintiff

5  filed a lawsuit against him, but this is inadmissible hearsay. Plaintiff also states that he spoke to

6  Reubart about the detainer's reactivation before the actual date of the reactivation, but he

7  provides no *details* about such conversation, such as when it occurred or what was said. Plaintiff

8  cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported

9  by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the

10 assertions and allegations of the pleadings and set forth *specific* facts by producing competent

11 evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

12          Plaintiff also argues that anyone can initiate the detainer process. Even if this were true,

13 Plaintiff presents no evidence of *Reubart's* involvement in reactivating the detainer.

14          Reubart contends that insofar as Plaintiff alleges Reubart cancelled his full classification

15 committee hearing, there is no evidence any such hearing was ever scheduled or subsequently

16 cancelled. Moreover, Reubart did not play any role in scheduling or cancelling any such hearing

17 for Plaintiff. As Associate Warden of Programs and Associate Warden of Operations at ESP, his

18 duties do not include, and have never included, scheduling full classification hearings, and he did

19 not cancel such a hearing for Plaintiff in the spring or summer of 2019. (Reubart Decl., ECF No.

20 118-8 ¶ 8.)

21          Plaintiff argues in his response that Reubart told him in person that he cancelled the

22 transfer and classification committee hearing *due to the reactivated detainer*. (Pl. Decl, ECF No.

23

1  124-1 at 2 ¶ 5.) He does not state Reubart said the hearing was cancelled because Plaintiff had

2  filed a lawsuit or was going to file a lawsuit against Reubart.

3      In sum, Reubart had presented evidence that he was not involved in the reactivation of

4  the Florida detainer. Plaintiff argues about whether the detainer was ever actually deactivated in

5  Florida or not, but the bottom line is that Plaintiff has provided no admissible evidence to create

6  a genuine dispute of material fact as to whether Reubart was involved with the reactivation of the

7  detainer. Reubart has also presented evidence that he was not involved in cancelling Plaintiff's

8  classification hearing, and Plaintiff fails to provide admissible evidence that the hearing was

9  cancelled by Reubart, or that it was cancelled *because of* Plaintiff's protected conduct.

10     For these reasons, summary judgment should be granted in Reubart's favor as to the

11  retaliation claim in Count IV. In light of this conclusion, the court need not reach Defendants'

12  remaining arguments.

13  **IV. RECOMMENDATION**

14     IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING**

15  Defendants' motion for summary judgment (ECF No. 118.)

16     The parties should be aware of the following:

17     1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

18  this Report and Recommendation within fourteen days of being served with a copy of the Report

19  and Recommendation. These objections should be titled "Objections to Magistrate Judge's

20  Report and Recommendation" and should be accompanied by points and authorities for

21  consideration by the district judge.

22

23

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: October 8, 2021

William G. Cobb
United States Magistrate Judge